(Decided January 27th, 1859.)

---

ALFRED G. BENSON AND RICHARD W. TRUNDY,
*vs.* ADINO P. ATWOOD, *et al.*

Under a charter-party which contemplated that the vessel should proceed
to the Lobos Islands for a cargo of guano, the contract is not *dissolved,*
nor the charterer excused from liability to the owners for its non-per-
formance, by the fact that the Peruvian Government refused to permit
the vessel to anchor or take guano from these islands, there being no ·
saving clause in the contract to meet such a contingency.

Where the charter-party does not provide against such a contingency as
the prohibition by a foreign government of the exportation of the stipu-
lated cargo, the contract is not dissolved, nor is the charterer excused
for not performing it, but must answer in damages.

In an action for damages for the violation of a charter-party by the
freighter, in not supplying a cargo, the law leaves the amount to be as-
certained by a jury, according to the liberal principles of interpretation
usually applied to commercial contracts, upon consideration of all the
circumstances, and of the real injury sustained by the owners.

Where the claim for damages arose from the default of the charterers, first
in delaying to send orders to the captain, as provided for in the charter-
party, and then in not furnishing the freight at the stipulated port, they
must make good any loss that may be fairly attributed to such default.

The vessel having arrived, as directed by the charterers, at the Lobos
Islands, for a cargo of guano, and being ordered off by the officers of the
Peruvian Government, the captain was at liberty to act upon his best
judgment for the interest of all concerned, and obtain a cargo at another
place, and was, therefore, right in sailing to Callao and Lima, and there
chartering the vessel for freight.

Benson & Trundy, *vs.* Atwood, *et al.*

A captain must not immediately come home without endeavors to freight his vessel, nor remain the whole time appointed, and charge the freighter with demurrage; he must use efforts to make the vessel earn as much freight as he can, so as to diminish the loss to the party who may ultimately suffer by the failure to obtain the stipulated cargo.

The owners are entitled to recover for delay caused by the failure of the charterer to furnish orders for the prosecution of the voyage, as provided in the contract, and for the loss of time occasioned by a new voyage undertaken by the captain, acting in good faith, and with due diligence and care, upon being unable to obtain the stipulated cargo.

In estimating the damage for such delay and loss of time, the sum agreed upon in the charter-party as demurrage, may be left to the jury as *prima facie* evidence; such a criterion is adopted as a rule of convenience and justice, open however to the owner to show there was *more*, and to the freighter that there was *less*, damage sustained.

A charter-party provided in one clause that the cargo was to be received "within twenty-five running days, exclusive of Sundays," and that the lay days shall be counted from the time the vessel is ready to receive cargo, and in another "that the lay days shall not exceed twenty-five." HELD:

That the lay days *excluded Sundays*, and the same allowance must be made for such lay days in reference to the new voyage undertaken by the captain, upon being unable to procure the cargo at the port stipulated in the charter-party.

A substitution, by mutual consent, of a new port for that named in the charter-party, without mention of lay days, will not affect the lay days stipulated for in the original contract.

The Appellate Court will not reverse an instruction granted to the appellees, because of an objection, the *benefit* of which was obtained by the appellants, in the *granting of a prayer* offered by them.

The charterers not furnishing instructions, as provided for in the charter-party, when the vessel was ready to sail, expenses incurred by the captain in *advertising* for the agent of the charterers, and the *cost of a protest* therefor, must be paid by the charterers, such expenses not being covered by *demurrage*.

Demurrage includes the hire and maintenance of the crew, and if the captain, in the exercise of his discretion, discharges the crew, paying them a *bonus* for releasing him from his contract, the owners cannot claim the sum so paid, *in addition* to the demurrage.

Expenses incurred by the captain in discharging his crew, and shipping another for the new voyage, and the port charges incurred in the prosecution of such voyage, undertaken by the captain for the benefit in part of the charterers, and by reason of their default, must be paid by them, and are not covered by demurrage.

Benson & Trundy, *vs.* Atwood, *et al.*

Damages sustained by delay, incurred by reason of the failure of the charterers to furnish instructions, as provided in the charter-party, and by the discharge of the crew, in consequence of not receiving such instructions when the vessel was ready to sail, are covered by demurrage, and cannot be allowed *in addition* thereto.

Where a charter-party provides that the cargo is to be received in twenty-five running days, such lay days are to be allowed for *loading*, and not for *orders* after the vessel was ready to sail on the voyage.

The fact that the owners executed a second charter-party *after* default made by the charterer under a *prior* one, cannot discharge him from all the consequences of his own violation of contract previously committed.

After default made by the charterer, the owners have the right to make another charter, to save themselves, and thereby benefit the charterer, and the *mere execution* of another charter cannot have the effect either of releasing the first, or of reducing the amount of damages for a breach thereof.

Where a new voyage is undertaken by the captain, upon failure to obtain the stipulated cargo, the charterers ought not to be charged with demurrage for the time consumed in the prosecution of such new voyage in bringing the vessel nearer home, which would have been consumed in performing the original voyage.

For the reversal of a judgment, the Appellate Court must confine itself to the exceptions taken by the appellant, but in finally disposing of the case, it may look to the rulings of the court below, on exceptions tendered by the appellee, and appearing in the record, though it cannot reverse the judgment *for his benefit*, he not having appealed.

Nor will the Appellate Court reverse a judgment upon the appellant's exceptions, where it can see that he will not be benefited by a new trial.

Where the amount of the verdict on a new trial is a mere matter of figures on written evidence, and nothing on that point would be left for the jury, and by such result the appellant would not be benefited, the Appellate Court may decide the question of amounts, and let the judgment stand.

APPEAL from the Superior Court of Baltimore city.

The proceedings in this case were commenced by an attachment on warrant sued out of the court below, on the 4th of June 1853, by the appellees against the appellants, and laid in the hands of Barreda & Brother, of Baltimore, as garnishees. The defendants appeared, gave bond, and the attachment was dissolved. The plaintiffs then filed their declaration in *assumpsit*. The cause of action was an alleged breach of a *charter-party* of the barque J. W. Paige, *owned* by the plaintiffs, and *chartered* by the defendants. The case was tried

under an agreement that "errors in pleading are waived, it being understood that the action in this cause is for an alleged breach of a charter-party of the 19th of June 1852."

*Defendants' Exception.* The charter-party, dated the 19th of June 1852, which was offered in evidence, and its execution proved, describes the vessel as "now on a voyage from Frankfort to San Francisco," and contains, among others, the following stipulations:

1st. The owners agree that the barque "shall sail immediately, as soon as she has discharged her present outward cargo at San Francisco, to one of the Guano Islands on the west coast of South America, between latitude one and fifteen south, as he shall be directed by the charterer, or his agent at San Francisco, for orders to be furnished him there, at said island, by charterer or his agent, to take thence or thence and from an adjacent Island, a cargo of guano, as may be directed."

2nd. "The charterer obliges himself to furnish to said vessel, at one or both those islands, all the guano which can be conveniently stowed away."

4th. "The captain is to receive the said cargo of guano within twenty-five running days, exclusive of Sundays. The captain to notify in writing to the charterer's agent at the islands, when his vessel is ready to receive cargo, and from such date until the ship may be loaded, the lay days are to be counted."

5th. "All port charges at ports or islands where the vessel may call for orders for loading, and for the cargo of guano, to be paid by charterer or his agent there."

8th. "On the vessel being loaded, the captain shall sail immediately, bound direct to Hampton Roads; vessel to have the privilege of using Callao or Valparaiso for the purpose of shipping crew."

9th. "The charterer obligates himself to pay to the captain or to his order, at the port of discharge, freight at the rate of $14 per ton of two thousand two hundred and forty pounds, nett English weight."

15th. "It is mutually agreed by parties that the lay days

shall not exceed twenty-five, and the charterer, should he detain said vessel beyond the number of days named here, shall pay to the master or owners the sum of $30 per diem for every day's detention beyond the number, payable at the port of discharge by said charterer or his agent. It is also understood and agreed that both parties are bound to fulfil their own obligations, as herein specified, and the penalty from one party to the other, for the non-performance of the stipulations of this charter, are mutually agreed to be the sum of $3500, to be paid in cash."

The vessel arrived at San Francisco on the 7th of September 1852, and on the same day the captain received a copy of the above charter-party. He then discharged his cargo, shipped a crew for the voyage, and was ready to sail by the 14th of September, but having made diligent inquiry in person and by advertisement for some agent of the charterers, and finding none, and receiving no instructions, he discharged his crew, paying them a bonus, went to a notary on the 17th and made his protest, which was offered in evidence, and wrote to the plaintiffs, his owners, that he could find no agent for the charterers, and requested their directions.

On the 7th of October the captain received a letter of instructions from Benson, one of the charterers, dated New York, September 4th, directing him to proceed with the vessel "direct to the Lobos Islands, situated in or near latitude 6° 59′ south, and longitude 80° 42′ west, and report yourself to the agent acting there, Capt. Jas. C. Jewett, and in case of his absence, to Mr. A. B. Howe, or in the absence of these gentlemen, to Capt. John O. Calebs, and there load your ship with guano, and when fully laden, proceed immediately to your port of destination, as per bills of lading presented by the agent to you to be signed therefor, as for charter-party."

He then shipped a new crew, and sailed for the Lobos Islands on the 26th of October, in ballast. The captain states that after writing to his owners, as before stated, he waited at San Francisco as long as he did hoping to hear from them; that he should have left between the 15th and 20th of October; that he had not got his crew shipped until the 18th, and not

Benson & Trundy, *vs.* Atwood, *et al.*

all then, and could not have got away before that time, nor have got any crew and got away before the 15th; that is, after he received the letter of instructions. He arrived at the Lobos Islands on the 13th of December, and was boarded by a Peruvian officer, who informed him that he would not be allowed to anchor, nor to go on shore; he found there no one claiming to act as agent for Benson and Trundy; Capt. Calebs arrived there the same morning, but claimed to give him no orders, and was himself ordered from the islands by the Peruvian officers.

On the same day the captain sailed for Callao, where he arrived on the 28th of December, and proceeded to Lima, where, having learned that Barreda & Brothers had, under the direction or permission of the Peruvian Government, taken at their charters the vessels which Benson & Trundy had chartered to the Lobos Islands, to load guano at the Chincha Islands, he chartered his vessel to them to load at the Chincha Islands. This charter-party, which was offered in evidence, is dated "Lima, December 31st, 1852," and stipulates for the payment of freight at $14 per ton of twenty hundred nett weight of guano, custom-house weight, and there was this endorsement thereon: "N. B.—It is understood that an additional freight of six dollars per ton shall be paid to the ship, according to the stipulations agreed to between the Peruvian minister and the Government of the United States." This charter-party provides for twenty-five working days to be allowed the charterers for loading the ship, those of bad weather and unforeseen impediments excepted, and that the vessel shall return to Callao for her clearance.

He then sailed for the Chincha Islands, took in his cargo of guano, having thirty lay days there, and on the day he completed his loading, he received another charter-party to Barreda & Brothers, of Baltimore, at $15 per ton. This charter-party, which was also offered in evidence, is dated "New York, October 20th, 1852," and was made between Buck & Co., as agents of the owners of the barque, and Barreda & Brother, acting as agents for the Peruvian Government. It describes

4      v. 13.

the vessel as "now on her way to San Francisco," and stipulates that she shall proceed with all convenient dispatch to the Chincha Islands, *via* Pisco, to load with guano, thence to return to Callao for her clearance, and thence to Hampton Roads; freight to be paid at the rate of $15 per ton, of twenty hundred pounds nett of guano, custom-house weights. This charter-party also provides for an allowance of twenty-five working days, to be allowed the charterers for loading, those of bad weather and unforeseen impediments excepted.

The captain then sailed for Callao, and thence, on the 14th of February, for Hampton Roads, and on his arrival there was ordered to proceed to Baltimore, which he did, and discharged his cargo of one hundred and ninety-five tons, and obtained from Barreda & Brothers, of Baltimore, $15 per ton only for freight, without any thing additional from the Peruvian Government. He agreed to deliver the cargo and settle the freight according to the charter-party of the 20th of October, and cancelled that of the 31st of December, and endorsed thereon a memorandum to that effect.

The expenses and charges proved by the captain, and claimed in his suit, were for seventy-six days' detention, at $30 per day, making $2280; cost of protest and advertisement at San Francisco, $27; commissions and port charges at Callao and Lima, $448.50; bonus paid to crew discharged at San Francisco, $111; the crew shipped at San Francisco were shipped for the voyage home, touching at the Lobos Islands, but when the captain found he could not load at these islands, and proceeded to Callao, and was delayed there, a large part of this crew left the vessel, and he was obliged to ship new ones at higher wages, and to pay higher wages to those who stayed, to induce them to remain, and this difference in wages and the expenses in shipping, and some other items of expense, amounted to $250. These items made in all $3116.50. From this, deducting the $1 per ton excess of freight paid under the charter-party of the 20th of October, over that which was to have been paid under that of the 19th June, $196, leaves $2920.50, the amount claimed.

The plaintiffs asked the following instructions to the jury:

Benson & Trundy, *vs.* Atwood, *et al.*

1st. That if the jury find the due execution of the charter-party of June 19th, offered in evidence; that the captain of the barque subscribed therein received it on his arrival at San Francisco, on the 7th of September; that he forthwith made diligent enquiry for the agent of the charterers, hiring, at the same time, a crew for the intended voyage; that on or about the 7th of October, instructions were given to him by the letter of the 4th of September, offered in evidence; that he obeyed these instructions by sailing from San Francisco for the Lobos Islands, on the 26th of October; that he arrived at these islands on the 13th of December, and was there in readiness to receive cargo and sign bills of lading, as instructed by the letter of the 4th of September; that no cargo was offered to him; that no further instructions were there given to him, and that he was not even permitted to land by the Peruvian officers, then the facts here stated hypothetically being found by the jury, the court instructs them that the captain was at liberty to act according to his best judgment, for the interest of the charterers.   And that if the jury further find that the captain left the Lobos Islands on the 13th of December; that he reached Callao on the 28th of December; that on the 31st of December he made the contract with Barreda & Brother, offered in evidence; that the captain proceeded at once to the Chincha Islands; that he loaded there with guano; that he returned thence to Callao, to clear for the United States; that he sailed for the port of his destination on the 14th of February 1853, and that in making the contract with Barreda & Brother, of the 31st of December, as well as in going to Callao from the Lobos Islands, he acted in good faith, and that in proceeding to execute the contract of the 31st of December, he used due diligence and care, then, these additional facts being also found by the jury, the court instructs them that the plaintiffs are entitled to demurrage for every day's detention, after deducting twenty-five lay days from the time when the barque was ready to sail from San Francisco to the time of her final clearance at Callao for the port of her destination, excluding the time of sailing from San Francisco to the Lobos Islands, and that in estimating the demurrage, the amount of

$30, stipulated in the charter party, is *prima facie* evidence of the sum proper to be allowed by them.

2nd. That if the jury find the facts stated hypothetically in the first prayer, in regard to the original charter party, the arrival of the barque at San Francisco, and the non-reception of instructions from the charterers until about the 7th of October, and further find that the captain advertised to ascertain, if practicable, whether there was an agent of the charterers in San Francisco, and that he made the protest offered in evidence, and paid the sums of $7 and $20, respectively, as the cost for the advertisement and protest, then the costs therefor are properly chargeable to the defendants.

3rd. That if the jury find the facts referred to in the second prayer, touching the original charter-party, the arrival of the barque at San Francisco, and the non-reception of instructions, and further find that the captain hired a crew for the voyage indicated in this charter-party, and that in consequence of the non-reception of instructions for the period aforesaid, he discharged the same, and paid them a bonus of $111 on the occasion of their discharge, to be released from his contract with them, then such sum is properly chargeable to the defendants.

4th. That if the jury find that the captain, on receiving instructions, on or about the 7th of October, to proceed to the Lobos Islands, shipped a crew therefor and thence to the United States, and that this crew left him at Callao, on his going there from the Lobos Islands, as stated hypothetically in the first prayer, on the plea that the voyage he was about to make was not the voyage they shipped for, and that, in consequence, the captain was obliged to ship a new crew, at an extra cost of $200, paid by him, then such sum is properly chargeable to the defendants.

5th. That if the jury find the facts stated hypothetically in the first prayer, and also find that the captain paid at Callao the sum of $448.50 for commissions and port charges on the visits of the barque to that port, then such sum is properly chargeable to the defendants, provided the jury believe that

Benson & Trundy, *vs.* Atwood, *et al.*

such payment was necessary, according to the regulations of the port at which they were paid.

6th. If the jury find the facts stated hypothetically in the first prayer, and also find that the barque, having sailed from Callao for the port of her destination on the 14th of February 1853, duly arrived in the port of Baltimore with the cargo taken on board at the Chincha Islands, under the charter-party of the 31st of December, and that Barreda & Brother, when requested to pay the freight of $14 stipulated therein, and the additional $6 provided for in the memorandum attached to and forming a part of this charter-party, claimed the benefit of a charter-party between the same parties of a prior date, to wit, October 20th, stipulating for $15 per ton; and if the jury believe that such a charter-party was in fact made, then the captain was justified in settling with Barreda & Brother, according to the charter party of the 20th of October, at $15 per ton, and that having charged the defendants with the price per ton stipulated in the original charter-party, and with the items properly chargeable to them under the foregoing instructions, the defendants are entitled to be credited with the sum of $15 per ton only, as per the charter-party of the 20th of October, and not with $20 per ton, as per the charter-party of the 31st of December.

7th. And the court further instructs the jury that if they believe that the captain was ready to sail from San Francisco on the 17th of September, and received no orders from the charterers to that effect until the 7th of October, then the jury are at liberty to allow such sum less than $30 per diem for that interval as they may deem proper to compensate the plaintiffs for the damages sustained by them in consequence of the failure of defendants to give instructions on the 17th of September, and till the 7th of October, excluding the sum of $111 heretofore allowed as damages consequent on the failure to give such instructions.

8th. If the jury believe, from the evidence, that the captain had a crew in readiness for the voyage contemplated in the charter-party, which he discharged in consequence of not having instructions, then the jury are at liberty to allow the plain-

tiff such damages as they may deem reasonable to compensate him for the delay at San Francisco, while engaged in shipping a crew and getting ready to sail, after he had received notice on the 7th of October.

The defendants then offered the following prayers:

1st. That by the charter-party for a breach of the stipulations of which this suit is brought, the defendants, after the vessel had discharged her outward cargo at San Francisco, and was ready to sail therefrom, were entitled to twenty-five days wherein to give orders or directions at that port to the master of the vessel to proceed on his voyage.

2nd. That no damage by way of demurrage can be claimed in this suit for any delay of the vessel, if the jury find any, at San Francisco, during such time as the captain was waiting to procure a crew, or for advices from his owners.

3rd. That if they find that the plaintiffs, by themselves or their agents, entered into the three charter-parties of the 19th of June, 20th of October, and 31st of December 1852, given in evidence, and further find that the vessel sailed from Callao for the Chincha Islands, for a cargo of guano under the last of these charter-parties, and further find that on the day the said vessel had completed her loading at the Chincha Islands, the captain received from his owners a copy of the charter-party of the 20th of October, and then sailed for Callao, and thence to Baltimore, and there delivered his cargo to the Messrs. Barreda, and received payment from them, in conformity with the stipulations of the charter-party of the 20th of October, and in consideration thereof likewise cancelled, by agreement with Messrs. Barreda, the charter-party of the 31st of December, and thus deprived the vessel from earning the sum of $20 per ton under the last mentioned charter-party, then the profits which the jury may find the plaintiffs might have earned by this last mentioned charter-party, over and above the profits which they could have earned by the charter-party made with the defendants of the 19th of June, are to be deducted from any claim for damages which the jury may find the plaintiffs have against the defendants for a non-compliance with the charter-party of the 19th of June.

4th. That no damage can be recovered by the plaintiffs for any delay of the vessel occurring after the execution of the charter-party of the 20th of October, if the jury find the execution of such charter-party.

5th. That no damages can be recovered by the plaintiffs for any delay of the vessel previous to the execution of the charter-party of October 20th, given in evidence, if the jury find that the same was duly executed on that day, except for such delay, if any, as may have occurred by reason of the detention of the vessel at San Francisco, after she had there discharged her outward cargo, and while she was there waiting for orders from the defendants or their agent, and that, under the charter-party of the 19th of June, the plaintiffs were bound to have a crew ready, so that the vessel could sail as soon as she discharged her outward cargo, and received such instructions.

6th. That if they find the facts stated in the defendants' 3rd prayer, and further find that the twenty-five lay days had not run out between the time that the jury shall find that the vessel had discharged her outward cargo at San Francisco, and was ready to sail upon the voyage mentioned in the charter-party of the 19th of June, and the time when the jury shall find that the master of the vessel received instructions from the defendants to proceed upon said voyage, and shall further find that after this last named period the vessel was delayed at San Francisco, either to ship a crew or to await instructions from the owners, until after the 20th of October, and that the said vessel subsequently sailed upon the voyages mentioned in the testimony of the captain, then the plaintiffs are not entitled to recover.

7th. That the plaintiffs cannot recover any demurrage for any part of the voyage between the Lobos Islands and Callao which the jury may find was no loss to the vessel in performing the voyage contracted for under the charter-party of the 19th of June.

The court (Frick, J.) granted all the plaintiffs' prayers except the *sixth*, which was rejected, and also granted the *second* and *third* prayers of the defendants, but rejected the others, the *seventh* being rejected "for want of evidence applicable to

the prayer." The defendants excepted to the granting of each of the prayers of the plaintiffs which were granted, and to the refusal to grant each of their own prayers which were rejected.

*Plaintiffs' Exception.* The plaintiffs excepted to the refusal of the court to grant their *sixth* prayer, and to the granting of the defendants' *second* and *third* prayers.

The verdict was in favor of the plaintiffs for $1326.79, and from the judgment thereon the defendants appealed.

The cause was argued before ECCLESTON, TUCK and BARTOL, J.

*Stewart Brown* and *Frederick W. Brune,* for the appellants:

The court will bear in mind, as part of the public history of our country, and in connection with the other facts of this case, that on the 5th of June 1852, Mr. Webster, as Secretary of State, wrote his famous letter of that date to Capt. James W. Jewett, who appears in this record as one of the securities in the bond under which the attachment was dissolved, and who wrote to him to inquire whether citizens of the United States could take guano from the Lobos Islands, without infringing upon the rights of the citizens, or subjects, or government of any other nation. Mr. Webster's letter thus concludes: "Under these circumstances it may be considered the duty of this government to protect citizens of the United States who may visit the Lobos Islands for the purpose of obtaining guano. This duty will be the more apparent when it is considered that the consumers of Chincha Island guano in this country might probably obtain it for half the price they now pay, were it not for the charges of the Peruvian Government. I shall, consequently, communicate a copy of this letter to the Secretary of the Navy, and suggest that a vessel of war be ordered to repair to the Lobos Islands, for the purpose of protecting from molestation any of our citizens who may wish to take guano from them." In consequence of this communication from the Secretary of State, Mr. Graham, Secretary of the Navy, on

the 16th of June 1852, instructed Com. McCauley, commanding the Pacific squadron, to send a vessel of his squadron to the Lobos Islands, for the protection of the citizens and commerce of the United States. On the 21st of August, Mr. Webster, having changed his views, wrote his letter of that date to Mr. Osma, the Peruvian minister, which concludes thus: "No countenance will be given to the authors of such enterprises, claiming to be citizens of the United States, who may undertake to defend themselves by force, in the prosecution of any commercial enterprises to these islands. Such acts would be acts of private war, and their authors would thereby justly forfeit the protection of their own government." And on the 25th of the same month, Mr. Kennedy, Secretary of the Navy, wrote to Com. McCauley, suspending the order of the 16th of June, and requiring him to abstain from aiding or abetting any citizen of the United States who may forcibly resist the execution of the laws of Peru, by the authority of that government. These letters and instructions were public acts of the government of the United States, and are within the *judicial knowledge* of the court. 1 *Greenlf. on Ev.*, sec. 479. They are embodied in the memorial of Benson, one of the appellants, presenting his case to Congress, and claiming compensation for his losses in this adventure, which memorial, for convenience of reference, we leave with the court.

In granting the appellees' first prayer, the court instructed the jury that if they found the facts set out in it, the plaintiffs were not only entitled to recover, but, as a matter of law, were entitled to *demurrage* for every day's detention from the time the vessel was ready to sail from San Francisco, to the time of her final clearance at Callao for her port of destination, after deducting twenty-five lay days, and the time consumed in the voyage from San Francisco to the Lobos Islands, and that in estimating the *demurrage*, the amount of $30 stipulated in the charter-party is *prima facie* evidence of the sum proper to be allowed. It does not submit to the jury any facts excusing or explaining the delay of the captain of the vessel in sailing from San Francisco, from his arrival there on the 4th of

5        v. 13.

September, until the 26th of October, except the facts that he made diligent inquiry for the agents of the charterers, and the receipt of the instructions of the 4th of September on the 7th of October. It does not require the jury to find the non-discovery of the agents of the charterers, nor the non-receipt of other instructions; nor does it even require them to find the time of the discharge of cargo at San Francisco, while the charter-party stipulates that the vessel shall sail *immediately* as soon *as she has discharged her cargo*, to a guano island, as he shall be directed. It also submits that the captain left the day of his arrival at the Lobos Islands, and submits that he was, while there, ready to receive cargo, but received neither cargo nor instructions, and was prohibited from landing, but it does not require the jury to find that no cargo would have been furnished at the Lobos Islands, if there had been no improper delay on the vessel's part at San Francisco, or if she had stayed out her lay days at the Lobos Islands, or had gone to an adjacent island. The proof is, that the captain obtained a more advantageous freight on account of the charterers at the Chinchas, while the prayer does not call on the jury to find that the Chinchas are not adjacent islands to the Lobos, within the meaning of the charter-party. The prayer also assumes, that under the facts submitted to the jury, it was not necessary that the master should report to Capt. Calebs, mentioned in the letter of September 4th, although it appears he was at the Lobos Islands when the vessel arrived, or notify him of his readiness to load there, or to seek cargo at an adjacent island, in compliance with the stipulations in the 1st, 2nd and 4th articles of the charter-party; and under this prayer the court further instructed them that the plaintiffs were entitled to recover, notwithstanding the jury might find all the other facts appearing in the record, or properly within the judicial knowledge of the court, the most important of which are:

1st. The change of views and instructions on the part of the Government of the United States, which appears from the State papers already referred to. According to the letter of the Secretary, of June 5th, the charter-party of the 19th of June was a legal contract, while under that of the 21st of August,

the contract is declared illegal, and the prosecution of it, if persisted in, an act of private war.

2nd. The charter-party of the 20th of October, and all the circumstances which followed it, viz: the performance of the voyage described in it, the delivery of the cargo to the charterers under it, the receipt of the freight money stipulated in it, and, in consideration of this, the cancellation of a subsequent charter-party made for the benefit of the appellants, and the release of all claim thereunder. The contract of the 20th of October was not a contract made in subordination to that of the 19th of June, because it does not refer to the previous charter, or any breach under it, but contracts to charter the vessel while on her way to San Francisco, and to proceed from that port with all convenient dispatch to the Chincha Islands, *via* Pisco.

This prayer further fixes the damages which the appellees are entitled to recover, and declares these to be *a per diem* allowance from the 17th of September to the 14th of February, after deducting the period of the voyage from San Francisco to the Lobos Islands, and *twenty-five* lay days only, while the charter-party allows $30 per day demurrage only, in the event of her staying over her lay days at the Lobos Islands, where she was to load. The prayer further fixes the lay days at *twenty-five*, while the charter-party allows twenty-five days exclusive of Sundays, which will give four days more, or twenty-nine in all. Under this prayer, and the refusal of the appellants' 7th prayer, the court below refused to make any deduction from the fixed rate of demurrage for such part, if any, of the voyage between the Lobos Islands and Callao as the jury might find would have been no loss to the vessel in performing the voyage under the original charter-party.

In granting the other prayers of the appellees, the court below allowed them to recover all the items of damage mentioned in those several prayers, *in addition* to the demurrage allowed in the first prayer, while the appellants contend that where a plaintiff is allowed to recover demurrage as stipulated damages, it must be on the ground that it covers all the damages to which the defendant can be liable. The 2nd, 3rd, 7th and

8th prayers, refer to the damages which the appellees incurred at San Francisco, and for which the appellants were held liable, and are all additional to the demurrage allowed at San Francisco under the 1st prayer. These items are under the 1st prayer; cost of protest and advertisement which are a proper claim for damages on account of detention unless covered by the demurrage: under the 2nd prayer the bonus for discharging a crew. This was an improper allowance even as damages for detention, unless it could be shown that it diminished the claim for damages, being less than the wages of the same crew during the improper detention, for under the charter-party, the vessel was bound to be ready with a crew to sail for the Lobos Islands, as soon as the outward cargo was discharged if the charterers should so direct; but this allowance is entirely indefensible if demurrage is already allowed, for a stipulated demurrage for detention with a cargo on board, must include the hire of a crew when the charter-party requires one to be on board.

The damages allowed in the 7th prayer are still more indefensible, for by the 1st prayer the appellees were allowed demurrage for the period at San Francisco, between the 17th of September and the 7th of October; and under the 2nd and 3rd prayers were allowed special damages incurred during that period, and yet the 7th prayer allows further damages less than $30 per day, after excluding one of the items of special damage already allowed. The 8th prayer proceeds upon the ground, that although under the appellants' 2nd prayer which was granted, the appellees were not entitled to damage *by way of demurrage,* for delay while they were engaged in shipping a crew at San Francisco, yet under the 8th prayer the court in effect held, that the appellees were not bound to have a crew in readiness to await instructions, but on not receiving instructions, the captain was not only entitled to discharge them and take time to get another crew after the receipt of instructions, but was likewise entitled to damages for the delay in procuring a new crew.

The 4th and 5th prayers allow special damages incurred after the arrival at the Lobos Islands, in addition to the de-

murrage which is allowed under the third prayer down to the final clearance at Callao. The damages allowed under the 4th and 5th prayers, are proper charges against the defendants, when the plaintiffs are called on to allow the amount of their earnings under a subsequent voyage in deduction of their claim against the defendants, but these as well as the items of damages previously referred to, seem to be embraced within the stipulated demurrage when properly allowed. To earn the freight as well as the demurrage stipulated in the charter-party, the plaintiffs were bound to have a crew on board at all times, and the 8th article of the charter-party concedes the privilege to the ship owner to go to Callao and Valparaiso to ship a crew without being chargeable with an improper detention.

The only questions of interest presented by the defendants' prayers, in addition to those already adverted to in considering the instructions granted for the plaintiffs, are those raised under the defendants' 4th and 6th prayers, which decide that the execution of the charter party of the 20th of October did not release damages for any detention after that period, nor did the execution of that contract with the other facts contained in the 3rd and 6th prayers of the defendants, prevent the plaintiffs recovery in that case. The appellants therefore contend:

1st. That while the letter of Mr. Secretary Webster, of June 13th, the plaintiffs and defendants were perhaps authorised to make the charter-party of the 19th of June having reference to the Lobos Islands under it, yet after the letter of the 21st of August, it became illegal to execute said contract, and the defendants were excused for not furnishing a cargo at said islands; *Parsons Mercantile Law*, 365, 366, and cases cited; 3 *Kent*, 248, 249, and cases cited; 10 *East*, 534, *Atkinson vs. Richie*; 2 *Johns.*, 336, *Scott vs. Libby*.

2nd. That by reason of the execution of the charter party of the 20th of October, and the prosecution of the voyage, the delivery of cargo, and earning of freight under it, and the consequent cancellation of the charter-party of the 31st of December, made for the benefit of the appellants, the appellees abandoned the charter-party of the 19th of June, and released

the appellants for all damages for any breach under it.   1 *Gill*, 311, *Howard vs. Wilmington & Susq. Rail Road Co.*   9 *Gill*, 293, *Rodemer vs. Hazlehurst.*   2 *Parsons on Cont.*, 187, 188, 190, 191, and cases cited.   4 *Wend.*, 289, *Dubois vs. Delaware & Hudson Canal Co.*   2 *Barn. & Adol.*, 303, 308, *Robson vs. Drummond.*   9 *Adol. & Ellis*, 550, 553, *Amor vs. Fearon.*   20 *Eng. Law & Eq. Rep.*, 157, *Hochster vs. De Latour.*

3rd. That if the appellants were bound by the charter-party of the 19th of June, to furnish a cargo at the Lobos Islands, and the charter party of the 20th of October did not discharge them from their liability, then they contend, that the appellees' right to recover is limited to the freight stipulated in the charter-party, and damages, if any, to be found by the jury for any improper detention of the vessel at San Francisco, but as the vessel did not use the lay days at the Lobos Islands, but left the day of arrival, the appellants should be allowed these days at San Francisco, and if the time beyond these lay days consumed by the captain in San Francisco, was to hire a crew or wait for instructions from his owners, to be found by the jury, the appellees are entitled to no damages for the detention at San Francisco   3 *Selden*, 262, *Ashburner vs. Butcher.*   4 *Binney*, 308, *Lee Comb vs. Waln.*   7 *Bing.*, 559, *Brereton vs. Chapman.*   2 *Smith's Lead. Cases, (Am. Notes,)* 41, 42, 51, and cases cited.

4th. That before the appellees can recover the freight and damages stated in the third point, they were bound to earn all the freight they could for the benefit of the charterers, and having, under the charter-party of the 31st of December, obtained a valid contract for $6 dollars per ton more than the freight stipulated in the charter-party with the appellants, they cannot recover more than nominal damages, unless the jury should find that the damages legally recoverable for any improper detention at San Francisco, together with the cost of the voyage to the Chincha Islands, over and above the voyage covered by the charter-party with the appellants exceeded the sum of $1170, which was the excess of freight stipulated under the charter-party of the 31st of December, and earned by

the ship over the freight payable under the charter-party of the 19th of June. And in estimating the cost of the voyage to the Chincha Islands, the jury should consider whether part of the time consumed in going from the Lobos Islands to Callao, was not employed in bringing the vessel nearer home on the voyage under the original charter party. *Abbott on Shipping*, 707. 1 *Car. & Kir.*, 686, *Harries vs. Edmonds*. 7 *Bing.*, 169, *Staniforth vs. Lyall*. 24 *Wend.*, 304, 310, 313, *Heckscher vs. McCrea*. 3 *Gray*, 94 to 97, *Bailey, et al., vs. Damon, et al. May's Law of Damages*, 145, 149.

5th. The appellees are not entitled to claim the stipulated demurrage of $30, for a single day, for this demurrage was agreed to be paid for any delay after the lay days at the Lobos Islands, the place of loading, while the vessel did not even come to an anchor there. 17 *Barb.*, 190, 191, *Clendaniel vs. Tuckerman*. 10 *Mees. & Wels.*, 502, *Kell vs. Anderson*. 9 *Car. & Payne*, 709, *Horn vs. Bensusan*. 16 *Mees. & Wels.*, 829, *Cropton vs. Pickernell*. 9 *Leigh.*, 543, 547, *Brown vs. Ralston*.

6th. The lay days were to be twenty-five days exclusive of Sundays, or twenty-nine working days.

7th. It was one of the appellees' stipulations under the charter-party of the 19th of June, to have a *crew* as well as captain and vessel to perform the voyages stipulated.

*A. S. Ridgely* and *C. J. M. Gwinn* for the appellees:

At the outset let us recur to the charter-party of June 19th 1852, in order that we may more fitly apply the law. Under this charter-party, the vessel chartered being then upon a voyage from Frankfort to San Francisco, we need scarcely say, that the voyage for which she was chartered by Benson and Trundy, legitimately commenced at the time the outward cargo was discharged at San Francisco, (32 *Eng. Law & Eq. Rep.*, 612, *Bruce vs. Nicolopulo,*) and when she was ready to sail. From the date therefore of September 14th, 1852, when the vessel was prepared to set out from San Francisco the contract attached.

The appellants seem to be under the impression, if we may

judge from their first prayer, (which was rejected,) that even
if it be admitted, that their responsibility as charterers properly
commenced at this date, yet they were entitled to the compu-
tation of the allowance of the stipulated *lay days*, from the
said 14th of September 1852.   In this view of their cause,
they have confounded their responsibility for the breach of
that part of their contract, which stipulated that the vessel
should sail as soon as she had discharged her outward cargo
at San Francisco, (in the breach of which the claim for de-
murrage arose,) with their responsibility not to exceed the
number of twenty-five days in lading or in lay days generally;
whereas the true construction of this charter is, that the twenty-
five lay days were to be allowed for *the loading of the vessel*,
and as this loading could only take place at the guano islands
under the charter-party, it cannot be conceived that there is
any thing in the 4th article which entitles the appellants to
claim the benefit of these lay days at San Francisco.   It was
the claim for demurrage or for damages in the nature of de-
murrage, that began at San Francisco and not the lay days.
The term "demurrage," used in the first prayer, is wholly
consistent with this view.   It is used as the term is used in all
the treatises which describe demurrage as a detention of the
vessel beyond the time stipulated for the voyage.   It applies
as well to the loss of time at the *commencement* of a voyage
as in its *progress*, and a claim for *demurrage* may arise—be
suspended by lay days—and again continue.   And even if it
were true, that under the terms of this charter-party, the ac-
tion *quoad* the period of time before the actual voyage from
San Francisco commenced, was for damages in the nature of
demurrage, (and to be so construed by the court, in order to
give effect under the agreement to waive errors in pleading,)
yet the language of the prayer describing it as "demurrage,"
is not so far a departure from technical language as to make
it an error in the appellees' first prayer.   For the prayer does
not resort to the charter-party as an absolute measure of dama-
ges, but as a mode of estimating demurrage or damage, for in
this case these are convertible terms.   Nor is there any thing
in the 15th article, which gives the 4th a different construc-

tion. The two clauses must be construed together, and the 15th is but the exclusion of any conclusion that a longer number of lay days shall be enjoyed by the charterers than that provided for in the 4th article. The 15th does not modify the express words of the 4th, that the lay days were to be counted from the time the vessel was ready to receive cargo at the islands.

But the vessel having started upon her voyage, and having arrived at the Lobos Islands, what was the condition of the parties? The charter-party of the 19th of June, means nothing, if its first clause is not to be understood as imposing upon the charterers the obligation to provide a full freight of guano, at the islands where the vessel was to proceed. This obligation was the very life of the contract. The compensation to the owners, for the employment of their ship, was to be derived from the sum paid for the transport of the cargo, and if the cargo was not in readiness the contract was broken. 1 *Pet. Adm. Dec.*, 207, *Giles vs. Brig Cynthia.* 2 *Gallison,* 73 to 75, *Kleine vs. Catara.* 4 *Wash. C. C. Rep.*, 123, *Palmer vs. Gracie.* 30 *Eng. Law & Eq. Rep.*, 319, *Schillizzi vs. Derry.* Nor was there any proviso in the contract, which affords any relief to the charterers on account of the refusal of the Peruvian Government to allow the vessel to be loaded at the Lobos Islands. The charter-party does not contain the proviso of "the restraints of princes and rulers excepted," which induced the court in the case of *Bruce vs. Nicolopulo,* to give judgment against the ship-owners on a plea setting forth such restraints. This charter-party is an *absolute contract to load,* made by those, who, having a right to protect themselves by qualifications of their agreement, if they had chosen to do so, (if the charterers had chosen to accept such a qualified agreement,) yet made it without qualifications, and so induced the owners of the vessel to enter upon it. He who selects the adventure must be held to see that he selects it with good reasons, and, deriving the profits from the venture, if it is successful, he must bear any losses which occur by reason of regulations of trade at his port of loading, whether known to him or not. If he covenants, in a word,

to furnish a lading to a ship in a *foreign port*, the prohibition of the government to export the intended article, neither dissolves the contract nor excuses a non-performance of it. 3 *Maule. & Selw.*, 267, *Barker vs. Hodgson. Abbott on Shipping*, 411, 742, (*7th Am. Ed.,*) *marginal page*, 308. 2 *Camp.*, 352, *Randall vs. Lynch*, and same case in 12 *East.*, 180. 36 *Eng. Law & Eq. Rep.*, 299, *Hurst vs. Usborne*. 3 *Bos. & Pull.*, 295, *Bright vs. Page*. 16 *East.*, 205, *Syverds vs. Luscombe*. The appellants indeed take a different view of the case. They contend that the letter of Mr. Webster, as Secretary of State, to Capt. Jewett, was a public act of the government of the United States, and that as such public act, *it is within the judicial knowledge of this court*, and that it, of itself, made the charter-party of June 19th legal. And they also say, that when the subsequent letter of Mr. Webster to Mr. Osma, the Peruvian minister, appeared, (which it is also contended is within the judicial knowledge of the court,) the voyage *then* became illegal, and the charterers were justified in abandoning it. The appellees dissent from all this reasoning. They admit the rule of law to be, "that courts will judicially take notice of the political constitution or frame of government of their own country; its essential political agents or officers, and its *essential, ordinary and regular operations*," (1 *Greenlf. on Ev.*, sec. 479,) but it is submitted, that the action of the government, even had it taken the form alleged by the appellants, does not come within the letter or spirit of this rule. It is going very far to consider the letter written by a Secretary of State, giving an opinion as to the rights of our citizens on a foreign soil a public act at all. But if it had a *quasi* character of this nature, and if the order given to the American squadron, in conformity with this opinion, were to be so regarded, yet it is clear that neither the one nor the other, are so far public acts, in the sense of the rule cited *as to dispense with proof*. Surely the letter or instructions, if they were written or given, are not more acts of State than proclamations for reprisals, or for a public peace, or than articles of war. Yet it has never been contended, that these were within the judicial knowledge of a court and need not be

proved. On the contrary, all that has been decided is, that they could be proved by testimony differing in character from that which would establish *private* acts. The official gazette, or acts of Parliament, or acts of Congress, or copies issued by a printer for the government, regularly appointed, are made evidence, but *evidence* must be adduced before the court. 5 *Term Rep.*, 443, *Rex vs. Holt.* 7 *Johns.*, 50, *Radcliff vs. United Ins. Co.* 8 *Price*, 89, *Atty. Gen. vs. Theak-stone.* 2 *Phillips on Ev.*, 108, *(Ed. of* 1849*).* 16 *Pet.*, 55, 56, *Watkins vs. Holman.* But independently of the view here taken, that such acts, *even if acts of State, required some form of proof*, it is submitted, that even if the court below had been competent to make such acts the basis of its instructions when no proof had been adduced, on the theory that they were within the judicial knowledge of the court, it is not competent for the *Court of Appeals* to assume the matters stated in the argument of counsel, as facts proper to influence their judgment. This court is restrained by acts of Assembly to the revision of the record before it, and if counsel have for any reason omitted to embody in the record such statements of public acts offered in evidence below, or not offered, as might have been sufficient to bring them before the Court of Appeals for its judicial cognizance, they cannot avail themselves of them there. The prayers of the appellants do not present in specified shape the views of the counsel, for the reason, as it is supposed, that these facts were not relied on below. Certainly no copy of a memorial of a citizen, whether a party to this cause or not, which purports to set forth as a part of his case certain papers to which official names are appended, can be properly read in the hearing of this court; for the paper printed by a private person, has not the sanction of authority in any shape, to show that the copies it sets forth are accurately transcribed, or indeed ever existed.

But passing by this point. The vessel being at a great distance from the control of the charterers, it became the duty of the captain, who was the agent of the charterers no less than of the owners, *(Abbott on Shipping*, 478; 1 *Story's C. C. Rep.*, 353, *Jordan vs. Warren Ins. Co.*,*)* acting in good faith,

to employ his vessel so as to save the charterers from loss upon their contract of the 19th of June. 4 *Wash. C. C. Rep.*, 123, *Palmer vs. Gracie.* But by the charter-party, the owners of the ship were entitled to demand of the charterers, that they should consume no more of the vessel's time than was necessary to sail from San Francisco to the Lobos Islands, to lade the vessel, and to return to Callao, to clear, and thence to the United States; so it follows, that if the captain, acting in good faith as the agent of the charterers, was obliged, in order to prevent a total loss to the charterers, to employ her a longer time than was necessary to accomplish this result, the charterers were liable to pay demurrage for this excess of time. The measure of this demurrage is precisely stated in the appellees' first prayer. In a word, the appellants are properly responsible for the excess of time legitimately spent in the voyage made for their protection, over the time which would have been spent if the voyage had been made according to the contract.

It is submitted, that it was not necessary to require the jury to find, in the first prayer of the appellees, the non-discovery of the agents of the appellants at San Francisco. The prayer states the fact of diligent inquiry made for the agent of the charterers, and the fact of the protest of the 17th of September. It was not, perhaps, even necessary that the plaintiff below should show that he had used diligence to find the charterers, since by the charter-party he was subject to the orders of the charterers' agents, when he was ready to sail. *They* were bound to take control of *him*, not he to search for *them*, and the claim for demurrage commenced, not when the captain was unable to discover who were to control his voyage, but when they were instrumental in the delay in not controlling his voyage. And it is also submitted, that the prayer is not wrong, because it submits to the jury to find, that the captain hired a crew at San Francisco; for this fact is but an element in the proof of *readiness for the voyage*, which, though not stipulated for in the charter-party, was yet made necessary for the execution of the contract of the charter-party. Nor is the prayer in error in what relates to events at the Lo-

bos Islands. The jury could not have been called on to say that something might perhaps have been done at the Lobos Islands, if something had not been done at San Francisco. They were only authorized to find *what was done at San Francisco*, and *what was done at the Lobos Islands.* These facts being found the court applied the law. It is quite certain, that in the absence of instructions, as to *the* islands he was to proceed to from the Lobos Islands, the captain was not obliged to go about looking for "an adjacent island," as the argument of the appellants seems to assume, when no instructions were given, as was directly contemplated by the charter-party. The letter of instructions did not require any further report to Captain Calebs than was made by the *presence* of the vessel at the islands. It was the duty of the charterer to see that his agents assumed their authority when the subject of the agency was within his jurisdiction. The charter-party contemplated no more than this. *Abbott on Shipping*, 414. 4 *Camp.*, 159, *Harman vs. Clarke. Ibid.*, 161, *Harman vs. Mant.*

The second, third, fourth, fifth, seventh and eighth prayers of the appellees were based upon the assumption of the liability of the appellants for expenses named. By the second, this liability was for the cost of protest and advertisement made necessary by the default of the charterers in not providing some person at San Francisco, who was authorized to give the necessary orders for the sailing of the vessel. By the third, it was for the expenses incurred in paying off the crew, which the master was bound, by the terms of the charter-party, to have in readiness when his cargo was discharged at San Francisco, and which, having engaged in order to fulfil his obligation, he was obliged to discharge afterwards as a necessary measure of prudence and economy, through the default of the charterers. By the fourth, it was for expenses incurred in shipping a new crew at Callao, because of his inability to oblige those whom he had shipped at San Francisco, to go on a different voyage from that for which they had shipped. This different voyage being a necessity imposed upon the captain, in his capacity as agent for owners and charterers, by reason

of the failure of the latter to give him freight at the Lobos Is-
lands, which would have enabled him to employ the seamen
shipped at San Francisco, in the voyage which they had agreed
to undertake.   By the fifth, it was for commissions and port
charges incurred in Callao, to which port he sailed in order to
procure employment for his vessel, when he was deprived, by
the default of the charterers, of the freight which had been
contracted to be given at the Lobos Islands, and which port
he would not, under the terms of his charter-party of the 19th
of June, have been obliged to visit, if this contract of affreight-
ment had been fulfilled by the charterers.

The seventh prayer is based on the reasoning given in the
consideration of the first.   It is not necessary to say more than
that the vessel being ready to commence her voyage, and be-
ing at the disposition of the charterers when she was in readi-
ness to sail, her detention, through their default, until the 7th
of October, was a damage to the owners for which the court
was right in directing the jury to give them compensation.
The eighth prayer is based upon the proposition, that the ex-
penses incurred by the appellees, after the 7th of October,
when the orders to proceed to the Lobos Islands were receiv-
ed were properly chargeable to the appellants, because such
expenses were the result of the failure of the appellants to give
proper orders to the captain of the vessel, on her being in rea-
diness, to proceed to sea from San Francisco.   For the crew
being discharged by the captain, in his capacity as agent for
all concerned, for reasons of obvious economy, the owners are
entitled to be reimbursed those expenses which were incurred
after the 7th of October, while the crew were being shipped
and the vessel made ready to sail; these expenses being dam-
ages growing out of the detention and inseparably connected
with it.   The damages claimed in the seventh prayer rests
upon the technical possession of the vessel by the appellants,
from the 17th of September, when she was ready to sail, ac-
cording to the terms of the charter-party.   The damages
claimed in the eighth prayer rests also upon the liability of the
charterers for the expenses made necessary by their default.
These items are not in addition to the claim of liability in the

first prayer. They are but the particular statement of the liability which the first prayer asserts.

What has been said sufficiently covers the points disclosed by the appellees' prayers, and it is now proper to discuss the rejected prayers of the appellants.

Their first prayer has already been discussed in connection with the argument on our first. Their fourth was properly rejected, because it either assumes that the charter-party of the 20th of October, superseded that of the 19th of June, and so liberated the appellants from all responsibility under the charter-party made with them; or else it assumes, that if it did not so free them, it yet released them from all damages resulting from the delay of the vessel, after its execution. The prayer is wrong, because, as a proposition of law, it is not true, that the charter-party of the 20th of October, was a rescission of that of the 19th of June. The owners and the charterers were alike bound by the charter-party of the 19th of June, and neither party to that contract was competent to abrogate it, without the consent of the other. We do not mean to be understood as saying, that no circumstance, in the dealing of the owners of a ship with the charterers, will amount to a rescission of a contract, of which the charterers can take advantage, but we do mean to say, that no such circumstance existed in this case, and that the *charterers* especially were prevented from treating this contract as rescinded, after the 20th of October, because having themselves been guilty of the default at San Francisco, they cannot take advantage of their own wrong to defeat the contract. 2 *Parson's on Cont.*, 191.

The appellants cannot claim when they obliged the owners of the vessel, by the default which took place at the Lobos Islands, to seek a cargo elsewhere; that the undertaking, on the part of the owners, to load a ship thus left unemployed, in distant seas, was an abandonment of the rights which accrued to them, under a contract which they had, on their part, endeavored faithfully to execute. The charter-party of the 20th of October, was one made by the owners in subordination to the relations already entered into between them and the charterers, *in order to their own protection and to the protection of the*

*charterers.* When the captain communicated to the owners, by letter from San Francisco, that he had found no agent of the charterers at that place, the owners were authorized, as the captain was, to make arrangements for the use of the vessel, "and ought not sullenly" to have suffered the vessel to depart from San Francisco on her return to New York, in order to charge the charterers with the whole penalty of the charter-party. *Abbott on Shipping*, 742. 3 *Bos. & Pul.,* 295, *note (a,) Bright, et al., vs. Page.* Therefore the chartering of the vessel by the charter-party, of the 20th of October, was not a rescission of the contract of the 19th of June, but was, in fact, a contract made, as we have said, in *subordination* to it, and for the advantage of the parties to it, and was such a contract as the necessities of the case imposed upon the owners. The delays of the vessel, after the 20th of October, were properly chargeable as damages, even after the execution of this last charter-party, *because these delays were the result of the original breach,* even if they occurred in the execution of another agreement.

Their fifth prayer is wrong for the reason that it assumes an obligation, on the owners of the vessel, to keep a crew in *instant* readiness to sail, whether the neglect of the charterers, to give instructions, had made the discharge of the crew, which had been engaged under the charter-party, necessary or not; and because, also, it assumes the charter-party, of the 20th of October, to be the termination of the responsibility of the appellants, under the original charter-party. Their sixth prayer is based upon the same theory of the rescission of the charter-party of the 19th of June, and fails, for the reasons already given, namely, that the contract still continued to bind the appellants. Their seventh prayer was rejected for want of evidence to sustain it. Nor was there any. The vessel, by the failure of the appellants to provide her with a cargo, was obliged to leave the Lobos Islands, and she left to search employment. The time spent in going to Callao was lost to the vessel, because of her lack of the cargo which was to have been supplied at the Lobos Islands, and because of the necessity imposed, by this lack of cargo, upon the master, acting in

good faith, to seek a cargo where he could obtain one, in order that he might, as the agent of the owners, as well as the. charterers, protect all concerned from loss, as far as was possible. The court, therefore, was right in rejecting this prayer.

The appellants, in their argument, relied upon the theory, that the *special damage* allowed by the court below, in the instructions of which they complain, were included in the ascertained penalty for demurrage, provided for in the charter-party. This is not the theory of the law. The sum stipulated in the charter-party is *prima facie* the measure of damage for the *simple detention*, which is the ordinary meaning of demurrage, as stated in the charter-party, but it was competent for the jury, *in view of all the circumstances*, to find *above* or *below* this sum, (2 *Camp.*, 616, *Moorsom vs. Bell. Abbott on Shipping*, 410,) and in determining what was proper to be paid, it was right for the court to instruct the jury, as to these items of charge which make up the damage. This the jury did here by the aggregation of the items of damage. But this stipulated demurrage is never the strict limit of recovery which the appellants suppose it to be.

For these reasons the appellees think that the judgment of the Superior Court ought to be affirmed.

TUCK, J., delivered the opinion of this court.

This is an action by the owners, against the charterers, of a bark, to recover damages for the non-performance of a charter-party, entered into on the 19th of June 1852, while the vessel was on her way from Frankfort to San Francisco. It stipulates that the "bark shall sail immediately, as soon as she has discharged her present outward cargo at San Francisco, to one of the guano islands, on the west coast of South America, between latitude one and fifteen south, as he (the captain) shall be directed by the charterer or his agent, at San Francisco, for orders to be furnished him there, at said island, by charterer or his agent, to take thence, or thence and from an adjacent island, a cargo of guano, as may be directed." It also provides for twenty-five running days, exclusive of Sundays, to receive the cargo; and for demurrage, at the rate of

thirty dollars per day, beyond the lay days.    The freight agreed upon was fourteen dollars per ton, of 2240 pounds.

The vessel reached San Francisco on the 7th of September, and was ready to sail again on the 14th of that month, but the captain, not finding orders there from the charterers, as contemplated by the contract, remained until the 26th of October, when he sailed for the Lobos Islands, according to their instructions, which he had received on the 7th.    Expenses were incurred at San Francisco, which, the plaintiffs say, resulted from the failure of the defendants to furnish orders when the vessel was ready to sail, on the 14th of September; these, as well as for the delay, they claim as part of their damages.

When the captain arrived at the Lobos Islands, on the 13th of December, he found no orders there, nor any person to represent the charterers, and being notified by an officer of the Peruvian Government, that he could not anchor, nor go on shore, he sailed the same day for Callao and Lima, in search of freight, where, on the 13th of December, he chartered the vessel to Barreda & Bro., for a cargo of guano, at the Chincha Islands.    The vessel proceeded on the voyage, took in cargo, returned to Callao for clearance, that being the port of the Chinchas, and sailed thence for Hampton Roads.    During the passages from the Lobos Islands to Callao, thence to the Chinchas, and again to Callao, and while remaining at the latter port, other expenditures were made by the captain, in respect to which, also, and for the vessel's delay, the plaintiffs seek to recover damages as having resulted from the defendants' failure to supply orders at the Lobos Islands.

In the meantime, on the 20th of October, the agents of the owners, at New York, had made a charter of the vessel to Barreda & Bro., for a cargo of guano, from the Chincha Islands, in which, as in that of June, she was said to be on her way to San Francisco.    This charter was delivered to the captain on the day he had completed his loading at the Chinchas, under the charter of December, and on arrival at Baltimore, he settled the freight with Barreda & Bro., at fifteen dollars per ton, of 2000 lbs., according to the October charter, without receiving anything additional, as provided by the Lima

charter of December, by which he was to have received twenty dollars per ton, of 2000 lbs.; and which he then cancelled.

The cause was tried upon an agreement as to the pleadings, and the verdict and judgment were for the owners. The plaintiffs offered eight prayers, all of which were granted except the sixth; and the defendants offered seven, all of which were refused, except the second and third. By their second they were allowed a deduction for the time spent at San Francisco, while the captain was procuring a crew and waiting to hear from the owners. By granting the defendants' third prayer, the court held that they were entitled to an allowance for the freight agreed to be paid by the December charter, having denied, by rejecting the plaintiffs' sixth, that the freighters should be held to the charter of October, in ascertaining the freight earned by the new voyage. The defendants appealed from the rulings against them, but the plaintiffs' exceptions were not brought before us by an appeal on their part.

Before considering the questions presented by the testimony offered at the trial, we must dispose of a point made on the part of the charterers, which, if ruled with them, would determine the controversy. It is contended, that this voyage was commenced after Mr. Webster, as Secretary of State, had written to James W. Jewett, stating that citizens of the United States might visit the Lobos Islands for the purpose of obtaining guano, and that this government would protect them in making such efforts; and that the Department having afterwards taken a different view of the subject, as indicated by its subsequent correspondence, and warned the merchant marine of the country, that all such enterprises would be undertaken at the peril of the parties engaged, this contract became illegal, and no recovery can be had upon it.

We are of opinion, that this view ought not to have such influence upon the case, even conceding that the correspondence, which is not in the record, should be judicially noticed by the court. There is nothing in the charter to show that the voyage was projected in consequence of the information received at the State Department. The Lobos Islands are

not mentioned, nor is there anything to indicate that it was made with reference to them alone. The guano might have been obtained at any of the islands on the west coast, between one and fifteen degrees south. If, as was said, we must assume that the Lobos Islands are within these degrees, we cannot ignore the existence of other guano islands, in latitudes within the terms of the contract, with reference to which, it might be argued, that the parties had undertaken the venture.

But, aside from this consideration, we are to deal with the question according to the actual condition of the Lobos Islands, without regard to what the parties may have supposed it to be. If the defendants were misled by the officers of this government, they cannot, on that ground, claim immunity from the obligations they have incurred to the plaintiffs. It was competent for them to have made their liability depend on the political *status* of the Lobos Islands, or on the captain's being able to load his vessel there. As the instrument contains no saving clause to meet the contingency that did happen, the case must be governed by the general rules applicable to such contracts, which are thus stated by Lord Ellenborough, in *Barker vs. Hodgson*, 3 *Maule & Sel.*, 267, where the charterer pleaded that he could not load the ship at the port, because there prevailed a pestilent disease, in consequence of which all intercourse was interdicted by the authorities of the place: "Perhaps it is too much to say, that the freighter was compelled to load his cargo, but if he was unable to do the thing, is he not answerable for it upon his covenant? Is not the freighter the adventurer who chalks out the voyage, and is to furnish, at all events, the subject matter of which freight is to accrue? The question here is, on which side the burthen is to fall. If indeed the performance of this covenant had been rendered unlawful, by the government of this country, the contract would have been dissolved on both sides, and this defendant, inasmuch as he has thus been compelled to abandon his contract, would have been excused for the non-performance of it, and not liable to damages. But if, in consequence of events which happen at a foreign port, the freighter is prevented from furnishing a loading there, which he has

contracted to furnish, the contract is neither dissolved, nor is he excused for not performing it, but must answer in damages.'' The same principle had been applied in several cases of similar character, and it may now be considered the established doctrine, where the contract does not provide against such a contingency as the prohibition, by a foreign government, to export the stipulated cargo. *Bright vs. Page,* 3 *B. & P.,* 295, *note. Atkinson vs. Ritchie,* 10 *East,* 201. *Abbott,* 310, 597, *(Edition of* 1846.*) Smith's Merc. Law,* 315. *Parson's Merc. Law,* 365. *Randall vs. Lynch,* 2 *Camp.,* 356. 12 *East,* 197. 3 *Taunt.,* 387. 16 *East,* 201. *Flanders on Mar. Law, sec.* 233.

It must be borne in mind, that the suit is, not to recover freight actually earned, according to the charter-party, but damages for violation of the contract, on the part of the freighters, in not supplying a cargo. In such cases the law leaves the amount to be ascertained by a jury, according to the liberal principles of interpretation usually applied to commercial contracts, upon consideration of all the circumstances, and of the real injury sustained by the owners, which cannot be settled properly by positive rules; and as this claim arose from the default of the charterers, in the first instance, at San Francisco, and afterwards at the Lobos Islands, it is but just and reasonable, that they should make good any loss that may be fairly attributed to such failure. *Abbott, ch.* 8. 3 *Kent,* 218, 219. *Giles vs. Brig Cynthia,* 1 *Peter's Adm. Rep.,* 207.

In passing upon the first prayer of the plaintiffs, the court was certainly right in saying that the captain, in the situation in which he was placed at the Lobos Islands, was at liberty to act upon his best judgment for the interest of all concerned, and obtain a cargo at another place, as he did. It would have been against the interest of owners and charterers, and inconsistent with his duty to both, to have remained there longer than was necessary to have ascertained whether the guano could be procured. On being ordered off, he had no alternative but to steer for another port. *Bright vs. Page,* 3 *Bos. & Pull.,* 295. The law does not allow the captain to come home, without endeavors to freight his vessel, immediately

on ascertaining that the cargo cannot be furnished, according to the charter; nor to remain the whole time appointed, and charge the merchant with demurrage. Acting for the interest of all concerned, under the circumstances by which he may find himself surrounded, he must use efforts to make the vessel earn as much as he can, so as to diminish the loss to the party who may ultimately suffer by the failure to obtain the stipulated cargo. *Abbott*, 597, *Smith's Merc. Law*, 284.

We are also of opinion, that the plaintiffs were entitled to recover for the delay of the bark at San Francisco, so far as that delay was caused by the failure of the defendants to furnish orders there, for the prosecution of the voyage; and for the loss of time between the arrival at the Lobos Islands and the final departure from Callao, if the captain acted in good faith, and with due diligence and care; for if the new voyage was occasioned by the default of the defendants, and took more time, the owners should be compensated for such additional use of their vessel, which would be for the whole time between the arrival at the Lobos Islands and the final departure from Callao, after deducting the lay days, and so much as was consumed in bringing the vessel nearer home, if there had been proof that such was the course of the new voyage.

In estimating the damage for delay and loss of time, the sum agreed upon as demurrage was properly left to the jury, as *prima facie* evidence. Some criterion must be observed, and considering the difficulty of procuring witnesses, in such cases courts should adopt that which appears to be the most convenient rule. This principle was adopted by Ld. Ellenborough, in the case of *Moorsom vs. Bell*, 2 *Camp.*, 616, as a rule both of convenience and justice; open to the ship-owner to show that more damage was sustained, and to the freighter to show that there was less. *Abbott, Part* 4, *ch.* 3, *sec.* 3, 306.

But here there was an allowance by the contract of twenty-five running days, exclusive of Sundays, at the place of loading. The prayer allowed only twenty-five lay days. Considering the fourth and fifteenth articles of the charter-party together, we think the lay days excluded Sundays, and that the prayer was erroneous, in restricting the jury to an allow-

ance of twenty-five. *Abbott, Part IV, ch. III, sec.* 2. 10 *Mees. & Wels.*, 331. *Smith*, 283. The owners agreed to allow certain days for loading, if the voyage had been according to the contract. As they are charging the defendants for the extra time in obtaining another cargo, it is not unreasonable that the same allowance be made. It has been decided, that a substitution, by mutual consent, of a new port for that named in the charter-party, without mention of lay days, will not affect the lay days stipulated for in the original contract. *Smith's Merc. Law*, 284. *Jackson vs. Galloway*, 5 *Bing. N. C.*, 71. (35 *Eng. C. L. Rep.*, 34.) The same principle should apply here, especially as the cargo actually obtained was of the same article as that with which the defendants had agreed to load the vessel. The fairness of the allowance is shown by the fact, that the charter-party made by the captain at the clearance port of these islands allows twenty-five working days, those of bad weather and hindrances excepted. In this respect the prayer was erroneous.

We need not inquire, nor do we intimate, whether this prayer was too broad in its scope, in not allowing the defendants a deduction for the vessel's delay at San Francisco, while the captain was waiting to procure a crew, and for advices from his owners, because, if the defendants' pretensions be well founded, they had the benefit of that view of the case, by the granting of their second prayer; and this instruction would not, on this ground, be reversed on their appeal, whatever might be the result, if the points were before us on the exceptions of the plaintiffs.

2. There was no error in granting the second prayer. The defendants having failed to send orders in time to San Francisco, and the captain being ready to sail before they arrived, the means he employed to obtain information were proper, and the expense should be paid by the party in default. It was not covered by the demurrage allowed in the first prayer.

3. The demurrage included the hire and maintenance of the crew. If the captain, in the exercise of his discretion, discharged his crew, we do not think the owners can claim, in addition to the demurrage, the expense or bonus paid as the

condition of releasing the captain from his contract with the seamen. If by this prayer the plaintiffs meant to claim this sum in addition to the demurrage, it was erroneous in point of law; and if such was not the design, the proposition should have been stated in terms less liable to mislead the jury.

4, 5. In sailing from San Francisco, the captain acted in execution of the defendants' instructions. If, on their failure to furnish orders at the Lobos Islands, it became necessary to sail for another port, for which the crew had not been shipped, and they insisted on being discharged, the captain had no alternative but to engage another crew. The additional expense is not covered by demurrage, and must fall on the charterers. The same principle must apply to the port charges at Callao, if incurred in the prosecution of the new voyage, undertaken, in part, for their benefit, and by reason of their default. The 4th and 5th prayers, therefore, were properly granted.

7, 8. The seventh and eighth prayers state the law correctly, if they are understood as not allowing the plaintiffs the expenses therein mentioned, in addition to the demurrage, which is the interpretation of the plaintiffs' counsel, and which we consider the correct view. Thus construed, they merely charge the defendants with items of actual loss or damage, according to the principle of *Moorsom vs. Bell.* But if these sums were claimed in addition to the demurrage, they ought not to be allowed.

We are next to consider those of the defendants' prayers, which were refused.

The first placed upon the contract a construction at variance with its plain meaning. The lay days were allowed for loading, and not for orders at San Francisco, and were properly deducted by the first prayer, from the whole time. The defendants were not injured by the refusal of this prayer, even if its propositions of law were correct.

The 4th was well refused. It is not pretended, that the December charter discharged that of June; why should that of October have such effect? They were both executed after default by the charterers, when the vessel was liable to be

chartered.  Whatever influence such act of an owner might have on the first charter, before a breach by the merchant, we are very certain that it cannot discharge him from all the consequences of his own violation of contract, previously committed, as proposed by this prayer.

5, 6.  These prayers are based on the idea, that if the charter of October, did not, of itself, release the merchants from their liability on the contract of June, yet, in connection with the facts enumerated in the fifth prayer, it ought to reduce the damages; and, in connection with certain other facts stated in the sixth, ought to discharge the defendants altogether.  To neither of these propositions can we assent, because the owners had the right to make another charter to save themselves, and thereby benefit the defendants, and its mere execution cannot have the effect, either of releasing the first charter, or of reducing the amount of the verdict.  What was done under that contract between the owners and the Messrs. Barreda, may be important in ascertaining the amount of loss to the plaintiffs; but the mere making of the contract can have no effect on their claim.

7. The seventh was not sustained by any evidence, unless the jury might be presumed to have knowledge of these places, and their relative positions, and distances, as well as the customary course of such voyages.  We have said, in discussing the plaintiffs' first prayer, that the defendants ought not to be charged with the time, if any, consumed in bringing the vessel nearer home.  For so much of the time she may be considered as having performed only what the owners had contracted she should do, without any loss to them by default of the defendants.

This being the appeal of the defendants, we must confine ourselves, for the reversal of the judgment, to their exceptions. In finally disposing of the case, however, we may look to the ruling of the court below, on those tendered by the plaintiffs, though we cannot reverse the judgment for their benefit, as they have not appealed.  Nor, indeed will a judgment be reversed on the appellants' exceptions, where the court can see that they will not be benefitted by another trial.  This we take to

be the condition of the present record. We have expressed our dissent from the judgment below, on the first and third prayers of the plaintiffs, which would entitle the defendants to a deduction from the items therein mentioned, not previously allowed; but my brother judges are of opinion that the court erred in refusing the plaintiffs' sixth prayer, and in granting the defendants' third, whereby they had the benefit of the freight stipulated in the December charter. Upon a *procedendo* they would be allowed a deduction only at the rate of the October charter, (for the court would not send the record back without an expression of their views on this disputed point,) and, as the difference between them is greater than the amounts gained by the defendants on their appeal, the verdict could not be less, but considerably more than the amount already recovered against them. So far as the difference between the charters is involved in this view of the case, the result is a mere matter of figures on written evidence, and nothing, on that point, will be left for the jury. We may therefore, without assuming any facts which the jury ought to pass upon, decide the question of amounts, and let the judgment stand. *Emery & Gault vs. Owings*, 6 *Gill*, 191. *Roloson vs. Carson*, 8 *Md. Rep.*, 226. *Duvall vs. Farmers Bank*, 9 *G. & J.*, 31, 51.

*Judgment affirmed.*

(Decided January 28th, 1859.)